

# NUMBER 13-19-00052-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ELTON WAYNE HOLMES,                                                       Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

## On appeal from the 117th District Court
## of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Tijerina**
**Memorandum Opinion by Justice Hinojosa**

A jury convicted appellant Elton Wayne Holmes of four offenses: accident involving death, a second-degree felony; accident involving serious bodily injury, a third-degree felony; aggravated assault, a second-degree felony, and negligent homicide, a state jail felony. *See* TEX. TRANSP. CODE ANN. §§ 550.021(c)(1)(A), (c)(1)(B); TEX. PENAL CODE ANN. §§ 22.02(a)(2), 19.05.

By eight issues, which we have re-numbered for the purpose of our analysis, Holmes asserts that: (1) there was insufficient evidence of the aggravated assault and negligent homicide offenses and the deadly weapon finding; (2) the trial court erred in admitting certain photographs; (3) testifying witnesses remained in the courtroom after "the Rule" was invoked; (4) the jury charge was erroneous; (5) the punishment constituted cruel and unusual punishment; (6) the trial court erred when it failed to grant his motion for new trial; (7) he received ineffective assistance of counsel; and (8) the judgments for Counts 1 and 2 were incorrect because they cite a deadly weapon finding.

We modify the judgment and affirm as modified.

## I. BACKGROUND

Holmes was indicted on four felony offenses which arose from a motor vehicle accident resulting in the death of one young woman, R.A., and the serious bodily injury of another, M.K.,[1] near the King High School campus in Corpus Christi, Texas. Trial began on January 9, 2019.

Before the State began its case-in-chief, Holmes's counsel invoked Texas Rule of Evidence 614 to exclude testifying witnesses from watching trial. *See* TEX. R. EVID. 614. The State requested that M.K., M.K.'s guardian, and R.A.'s father be allowed to remain in the courtroom. The trial court granted the request over Holmes's objection under article 36.03 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN.

---

[1] We use initials to protect the names of the minors in this case. *See Salazar v. State*, 562 S.W.3d 61, 63 n.1 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (noting that the comment to Texas Rule of Appellate Procedure 9.8 does "not limit an appellate court's authority to disguise parties' identities in appropriate circumstances . . .").

2

art. 36.03 (allowing certain qualifying witnesses to remain in the courtroom during trial).

## A.     The State's Case-In-Chief

The State first called Charles Burns who testified that he picked up his daughter from high school on March 27, 2018. He stated that he was on the corner of Mustang Trail and Staples Street preparing to make a left-hand turn onto Staples when his light turned green. He pulled into the intersection but paused when he saw two girls crossing Staples Street using the crosswalk. Burns saw the girls laughing and thought one of them might have been on her cell phone. Burns then saw a "dark colored" vehicle enter the intersection at a "high rate of speed." According to Burns, although the vehicle had a red light, it drove through the crosswalk and hit the girls directly. Burns testified that the driver "didn't—the person didn't swerve, they didn't brake, they didn't do anything, they just went straight through them. And when they went—and when he hit them, they were like separated, so they had their backpacks on, so I see the two girls fly up in the air." The car left the scene.

Burns stated that he pulled over immediately and had his daughter call his wife. He got out of the car and saw other parents exiting their vehicles quickly to help as well. One mother told him she was calling 9-1-1 so he went to the girl lying in the middle of the street, later identified as R.A. Burns testified that R.A. was not breathing or moving. She had been "knocked out of her shoes." Burns stated that the other girl, M.K., was screaming and he saw other adults attending to her. He believed M.K.'s leg was broken. Burns stated that he thought the school traffic lights were off because it was about 4:45 to 5:00 p.m., but that the area was marked as a school zone.

3

Flora Esparza testified that she was waiting at the red light when a vehicle passed her on her right side. She stated that the vehicle was a silver SUV that "went through the actual light and hit the girls," "intentionally" revved its engine two to three times, and "took off like it [was] nothing." Esparza recalled that she immediately pulled her car into a nearby dental office, parked, and ran into the intersection to check on R.A., who was lying in the street. R.A. was disoriented and asked Esparza, "What happened to me?" and "Where is my mom?" Esparza then ran to M.K. who told Esparza R.A.'s name. When Esparza looked back at R.A., "she was lifeless. Her body was white and pale." Esparza did not recall if the school zone lights were flashing at the time of the accident. She also said she did not think the girls were on their phones as they crossed the street because she retrieved each girl's phone from their respective backpacks to try to call their parents. She further recalled that there was a third girl, V.L., who was walking with R.A. and M.K. but was not in the accident.

Delia Flores testified that she was a passenger in her daughter Jennifer Flores's car on the day of the accident. She recalled Jennifer slowed her car as they approached the intersection of Mustang Trail and Staples. The light was red. Delia saw three young girls walking on the crosswalk. She heard Jennifer say, "That car is coming too fast" and saw the girls waving at a vehicle to get it to stop. Delia saw the girls get hit by the moving vehicle, which Delia remembered being "a gray, silver, something like that" color. She said the vehicle "stopped for a little while and then . . . took off." Delia remembered the driver was wearing a red shirt. She said Jennifer decided to follow the vehicle when it failed to stop while others were rendering aid to the girls. Jennifer made a U-turn to look

4

for the vehicle, and Delia believed Jennifer ultimately pulled into an Amco gas station when they spotted the silver vehicle that hit the girls. Jennifer got out of her vehicle to speak to the driver, who was in fact wearing a red shirt. Delia wrote down the vehicle's license plate number and later gave it to law enforcement authorities.

Jennifer testified next. She recalled seeing three young girls laughing near a grassy area and then two of them stepping into the crosswalk to cross the road. Then she saw a vehicle hit the two girls—the girls got "thrown around, dragged by tires and run over more than once." When she saw others rendering aid to the girls, she made a U-turn to follow the driver who hit them. She testified that she was not able to find the car immediately and remembered telling her mom to "[l]ook for his vehicle because I don't see him." Jennifer said her mother finally saw the car parked in a Pizza Hut parking lot. The driver had stopped his silver Jeep, his driver's door was open, and he was "underneath the front of the vehicle trying to pull parts of the vehicle from underneath."

Jennifer recalled the man was African American and he was wearing a red shirt. She stated that she kept her distance from him and yelled to him, "Hey, guy, stay right there. You hit two girls. Police are on their way." She testified that the man got up from the parking lot, looked confused, and said, "What?" She reiterated, "Don't move. You hit two girls. The cops are on their way." According to Jennifer, he said, "I didn't f—cking hit anybody" and acted "like he was going to charge" her. Instead, though, she recalled he got into his vehicle, and left "like a bat out of hell." Jennifer stated that she then called 9-1-1 but could not get through. Therefore, she and her mother went back to the scene of the accident and told the first police officer they saw that they had the license plate

5

number of the vehicle involved. Jennifer later went to the police station where she identified Holmes out of a photo lineup. She also identified him in the courtroom.

Noe Lira, M.D. is a Corpus Christi obstetrician/gynecologist whose office faced the intersection at issue. Dr. Lira recalled that on the afternoon of the accident, one of his staffers ran to the back of the office where he was working. The staffer informed him that a young man had come in saying that two girls had been run over in front of the office. Dr. Lira ran outside. He saw both R.A. and M.K. lying in the street. He said he ran to M.K. first because she was calling out saying, "How is my friend?" Dr. Lira noticed that M.K.'s leg was twisted and he told the people around M.K. not to move her because if she had a femoral internal fracture, the femoral artery could be lacerated. He then proceeded to R.A., who was motionless. He checked R.A.'s pulse in her arm and carotid artery and used his stethoscope to check for a heartbeat but found nothing.

Reynaldo Garza, R.A.'s father, testified over Holmes's objection that Garza had remained in the courtroom in violation of the Rule. *See* TEX. R. EVID. 614. The court overruled the objection and cited article 36.03 of the code of criminal procedure as the basis for its ruling. *See* TEX. CODE CRIM. PROC. ANN. art. 36.03. Garza stated that he was a single dad of R.A. and her brother, and that his mother lived with them as well. Garza testified that he did not have any first-hand knowledge of the accident. He recalled that when he received a phone call at work that R.A. had been in an accident, he left immediately and went to the scene of the accident. He saw his daughter lying in the street and tried to go hold her, but police officers kept him at bay.

Kyra Godeke, a police officer with the City of Corpus Christi Police Department

6

(CCPD), testified that on the day of the accident she was off-duty driving in her personal vehicle when she observed a gray SUV traveling on Staples with "an abnormal amount of heavy front[-]end damage." She noticed the vehicle's front bumper rubbing against the tires and saw the vehicle pull into a Pizza Hut parking lot. She also noticed that traffic began to back up on South Staples Street, indicating that there was a possible accident ahead. Godeke followed the vehicle and called 9-1-1 as she believed the vehicle may have been involved in a hit-and-run accident. Godeke stated that a black male wearing a red polo shirt exited the vehicle and went to the front of the vehicle to assess the damage. She noticed a woman approach the man and wave her hands at him, and he responded by putting his hands up and shaking his head "no." Godeke saw him get into the vehicle and leave the parking lot at a high rate of speed. She tried to follow the vehicle to write down its license plate but because she was in plain clothes and in her personal vehicle, she knew she had to follow the speed limit. In the courtroom, Godeke identified the Holmes as the driver she saw in the Pizza Hut parking lot.

CCPD Officer Michael Castillo testified that police received license plate information and were able to locate the vehicle based on that information. He stated he arrived at Holmes's residence at approximately 5:06 p.m. and saw the garage partially open. When he looked inside the garage, he saw a silver jeep hissing and verified the license plate. Lindsey Goldnick, Holmes's fiancée, was in the garage. Goldnick gave officers permission to search the home, but Holmes was not there. Goldnick said Holmes had come home, changed his clothes, and left to a friend's house. Holmes was ultimately found next door, at his grandmother's house.

7

Lieutenant Javier Cantu arrived at Holmes's residence. He learned from Goldnick that Holmes was next door. Lieutenant Cantu crept along the side of the grandmother's house with his patrol rifle and saw two black males—Holmes and his cousin Jeremy Broadnax—in the backyard through a metal gate. Lieutenant Cantu explained that he used his firearm because he was following up on a felony hit-and-run where someone had died, so he had authority to "use any force necessary to take whoever was a suspect into custody." Cantu ordered both men to get down to the ground, but Broadnax pointed to Holmes and only Holmes got down on the grass.

CCPD Officer Imelda Rjasco testified that, on the day of the accident, she was dispatched to Holmes's location. When she arrived, she approached the rear of the residence where she saw Lieutenant Cantu had a subject on the ground at gunpoint. She stated that she handcuffed the subject and led him to Officer Castillo for transport to the police station. Officer Rjasco stated that the subject's cousin Broadnax gave officers the subject's name—Elton Holmes. Officer Rjasco identified Holmes as the subject being arrested and read him his *Miranda* warnings. She also stated that the vehicle that was involved in the accident was at that location, as well as the red polo shirt his fiancée Goldnick said he had changed out of earlier in the day.

Detective Enrique Roman was CCPD's main investigator of this felony hit-and-run investigation. He stated that he first interviewed Delia and Jennifer at the police station regarding their observations and how they got Holmes's license plate information, and then interviewed Holmes. Detective Roman stated that prior to the beginning of the interview, he read Holmes his *Miranda* rights again. Detective Roman stated that, at the

8

beginning of the interview, Holmes was evasive about his answers, and merely repeated some of the questions Detective Roman asked. Holmes eventually explained to Detective Roman that he was on his way to Sears to pick up a pair of prescription glasses. Holmes stated that he was traveling down Staples when he reached down to pick up a pack of cigarettes on the floorboard and "felt something." Holmes claimed he looked in the rearview mirror and did not see anything, so he proceeded to drive. He ultimately pulled into a Pizza Hut and saw the damage on his car. Detective Roman then asked Holmes, "so when you got off and saw that there was damage, why wouldn't you want to go back and . . . see what you actually wrecked into?", but Holmes did not answer. When Detective Roman questioned Holmes about his confrontation with Jennifer at the Pizza Hut, Holmes first denied any confrontation but then stated that someone "told him he hit something."

Detective Roman testified that when he told Holmes that he struck two pedestrians, killing one and seriously injuring the other, Holmes began screaming. "He kind of went into like a—like a loud crying noise, and then he rolled around on the floor, was . . . moving the chair around with one hand. And then he kind of just laid faced down on the floor" for ten to twelve minutes. Detective Roman did not, however, observe any tears. Detective Roman offered Holmes something to drink and left the room. As part of his investigation, Detective Roman reviewed reports from each individual officer who reported to the accident that day, creating a case log. When Detective Roman examined the vehicle, he commented that "there was a lot of front[-]end damage for essentially hitting people . . . I typically see that kind of damage when it is hitting another vehicle." Detective Roman

9

confirmed that investigators did not retrieve any information from the vehicle's black box, that the airbags did not deploy, and that no DNA was recovered from swabbing the vehicle. He also admitted that the eyewitnesses who were interviewed all gave inconsistent statements about the vehicle, its speed, and the light signals.

The State then called Brandy Wade, the mother of M.K., to the stand. Prior to her testimony, the trial court reiterated that it had allowed Wade to remain in the courtroom under article 36.03 of the code of criminal procedure. Wade testified that on the day of the accident, she received a phone call at about 4:51 p.m. while she was at work. The person on the phone told her that her daughter had been in an accident. Wade left work immediately and rushed to the hospital. When she arrived at the emergency room, she found her daughter covered in blood and in shock. Wade testified that her daughter's left femoral artery had been severed and her left femur was broken. Doctors grafted the artery to repair it, placed her leg in a halo, and later inserted a titanium rod to stabilize the leg. M.K. also had serious eye injuries. Wade testified that M.K recuperated in the hospital for eight days. She stated that M.K. still cannot run, has difficulty leaning down, and has scars on her legs, arm, and face.

M.K. testified that she was currently sixteen years old and a junior at King High School. Regarding the accident, she recalled that she and her best friend R.A. had gone to the corner of Mustang Trail and Staples to wait for R.A.'s boyfriend, who was taking the bus to meet them at their high school. The group was then planning to return to campus for Color Guard tryouts. She recalled looking both ways before she and R.A. crossed Staples. She did see Holmes's vehicle, but recalled that it was "down the street

10

a bit . . . ." She testified that she thought the car "was a safe distance" and that its "light was red." She and R.A. held hands as they crossed the street, when suddenly the vehicle was "right there." M.K. testified that she did not specifically remember the car in much detail, just that she "tried to pull [her]self and jump out of the way." She next remembered lying on the ground and looking up at the sky. She testified that pain "was radiating from [her] left leg, and just radiating all over" her body. M.K. recalled that a woman approached her and asked if she was okay, who her mother was, and where her mother worked. M.K. kept asking about R.A. but stated no one would answer her.

M.K. testified about her leg surgeries and stated that she could not walk for two to three months. She was relegated to a wheelchair and bed for those months and attended physical therapy several times a week. She still has difficulties wearing certain shoes and walking upstairs. Further, she cannot wear eye makeup because one of her tear ducts is scarred. When M.K. finished testifying, the State rested its case.

**B.    Motion for Directed Verdict**

Outside the presence of the jury, Holmes's counsel moved for a directed verdict regarding the issue of a deadly weapon for Count 1, accident involving death, a second-degree felony; and Count 2, accident involving serious bodily injury, a third-degree felony. Counsel argued that

> Count 1 and Count[] 2 are failure to stop and remain at the scene. The vehicle operated by Mr. Holmes to leave the scene was not used in any way as a deadly weapon after the accident. . . . There has been no evidence adduced in this case that the car was used as a deadly weapon in any manner to leave the scene of the accident, after the accident had already occurred.

> The trial court agreed with Holmes and granted the directed verdict on the deadly

11

weapon issue. It stated that the offenses were "the old failure to stop and render[] aid" offenses and ruled that in regard to Counts 1 and 2 only "there is no need for a deadly weapon finding, in that accident involving death and accident involving serious bodily injury have to deal with stop[ping] and rendering aid."

## C.    Holmes's Case-in-Chief

Eugene Nedd, III testified that he was picking up his stepdaughter from Little Feet Daycare, which is located on Staples near King High School. He stated that his stepdaughter was crying because her electronic tablet was not working and she threw it onto the floor of his car. Nedd reached down to pick up the tablet and then pulled into a doctor's office to reset it when he saw two vehicles go through a yellow light on Staples, one of which was Holmes's vehicle. He did not think either of the vehicles was speeding. He witnessed the accident but did not stay at the scene because he saw other people stopping to render aid and he had to pick up his wife from work. He later realized that he knew the driver of the vehicle, Holmes. Nedd is related to Holmes; Holmes is his brother-in-law's uncle. Nedd also knows Holmes's mother and nephew. On cross-examination, Nedd testified that he did not contact police at any point to relay that he saw Holmes drive through a yellow light. Nedd further admitted that he had been convicted of theft and burglary in 2003.

Troy Martinez, Ph.D. is a licensed psychologist with a doctorate in clinical psychology. He testified regarding the concept of "fight, flight, or freeze." Dr. Martinez stated that the concept of fight or flight is an acute stress response that is the "body's physiological response to danger, whether it be attack, threat, perception of threat . . . or

12

basically something that's going to generate affirmative action." He testified that when humans witness a traumatic event, they have milliseconds to make a judgment while their bodies are being flooded with chemicals like serotonin, dopamine, epinephrine, and adrenaline. Dr. Martinez stated that "it's not uncommon for there to become a numbing or detachment effect." Dr. Martinez opined that this effect can last anywhere from twenty to sixty minutes.

Leopoldo Sanchez is a licensed private investigator with the Texas Department of Public Safety, Private Security Bureau. He was hired by Holmes to investigate the accident scene. Sanchez videotaped the intersection where the accident occurred on a school day at around 4:49 p.m. Sanchez testified that, based on his investigation, there is never a safe time for a pedestrian to safely cross that crosswalk, and that the intersection is unsafe. The defense closed its case-in-chief and both parties proceeded to closing arguments.

## D. Charge Conference

The defense objected to the jury charge instructing that the aggravated assault and negligent homicide offenses occurred in three different manners, in the disjunctive, without requiring unanimity for one particular means. The three different manners cited in the charge were that Holmes committed aggravated assault and negligent homicide by running a red light, speeding, or failing to yield to pedestrians. The trial court overruled this objection.

## E. Verdict and Punishment

The jury convicted Holmes on all four counts. The case proceeded to the

13

punishment phase. The State announced that it planned to use certain prior convictions to enhance the punishment range. Holmes objected to the proffered judgments, arguing that while they may be authenticated because they were certified copies with a raised stamp or seal, that the State also needed to provide a "nexus" to connect Holmes to these convictions. The nexus, for example, could be a fingerprint expert or a State identification number that was common to the judgments. After hearing eyewitness testimony outside the presence of the jury, the court allowed two prior felony judgments to be submitted to the jury: a 2006 Guadalupe County felony for possession of a controlled substance, PG 1, and a 2015 felony for assault on a public servant from Nueces County.

After finding the habitual felony offender enhancements to be true, the jury assessed punishment as follows: seventy-five years for Count 1, fifty years for Count 2, fifty years for Count 3, and twenty years for Count 4. The sentences were ordered to run concurrently at the Texas Department of Criminal Justice—Institutional Division.

## F.      Motion for New Trial

On February 13, 2019, Holmes filed a motion for new trial arguing there was insufficient evidence in the punishment phase of the trial linking the Guadalupe County felony to him. Two weeks later, on February 25, 2019, Holmes filed an amended motion for new trial, contending that the State failed to provide exculpatory impeachment evidence that two of the State's witnesses, Delia Flores and Flora Esparza, had prior crimes of moral turpitude. The trial court denied the motion for new trial on the first ground. The court did not consider the grounds proffered in Holmes's amended motion for new trial because the State objected that it was untimely under Texas Rule of Appellate

14

Procedure 21.14, and the court sustained the objection. *See* TEX. R. APP. P. 21.14.

Holmes appeals.

## II.     THE SUFFICIENCY OF THE EVIDENCE

Holmes contends the evidence admitted at trial was legally insufficient to sustain the aggravated assault conviction, negligent homicide conviction, and the deadly weapon finding.

### A.     Standard or Review

The Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution requires that a criminal conviction be supported by a rational trier of fact's findings that the accused is guilty of every essential element of a crime beyond a reasonable doubt. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 316 (1979)). This due process guarantee is safeguarded when a court reviews the legal sufficiency of the evidence. *Id.* Under this review, we consider all of the evidence in the light most favorable to the verdict and determine whether a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014); *Jackson*, 443 U.S. at 319. Because the jury is the sole judge of the credibility of the witnesses and of the weight to be given to their testimony, we resolve any conflicts or inconsistencies in the evidence in favor of the verdict. *Ramsey v. State*, 473 S.W.3d 805, 808 (Tex. Crim. App. 2015); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

We measure the legal sufficiency of the evidence against the elements of the

offense as defined by a hypothetically correct jury charge for the case. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Id.*

**B.    Analysis**

Holmes challenges the sufficiency of the evidence for his aggravated assault offense, negligent homicide offense, and for the deadly weapon finding on each of these crimes.

### 1.  Aggravated Assault

A hypothetically correct jury charge for aggravated assault would require the State to establish beyond a reasonable doubt that Holmes intentionally, knowingly, or recklessly caused serious bodily injury to another. *See* TEX. PENAL CODE ANN. § 22.02(a)(1). Here, Holmes challenges the recklessness element. A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Id*. § 6.03(c).

The record shows that the accident occurred in a school zone on a weekday afternoon. Five witnesses—Burns, Esparza, Delia, Jennifer, and M.K.—all witnessed Holmes run a red light with his vehicle. Only one witness, Nedd, thought Holmes drove through a yellow light. Holmes himself admitted to reaching down for a pack of cigarettes and feeling "something" happen to his vehicle. Three of the witnesses (Burns, Delia, and Jennifer) thought Holmes's vehicle was speeding, and Esparza recalled that the vehicle

16

intentionally revved at the intersection. Nedd did not witness speeding. In addition, both Burns and M.K. testified that the pedestrians had a walk signal at the time of the accident.

Holmes argues that "in this case, the record contains no evidence or even a modicum of evidence probative of the required element of recklessness." We disagree. Various witnesses testified that they witnessed Holmes run a red light at a high rate of speed in a school zone and immediately leave the scene of the accident. Although there was conflicting testimony, we defer to the jury on the issues of witness credibility and the weight to be given to their testimony and resolve any conflicts or inconsistencies in favor of the verdict. *Ramsey*, 473 S.W.3d at 808; *Wesbrook*, 29 S.W.3d at 111. Viewing the evidence in the light most favorable to the verdict, we find that a reasonable juror could have determined that Holmes recklessly caused serious bodily injury to M.K. *See Whatley*, 445 S.W.3d at 166; *Jackson*, 443 U.S. at 319.

### 2. Negligent Homicide

A hypothetically correct jury charge for negligent homicide would require that the State establish that Holmes caused the death of an individual by criminal negligence. *See* TEX. PENAL CODE ANN. § 19.05. Here, Holmes challenges the element of "criminal negligence." The Texas Penal Code provides that

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(d).

17

It is undisputed that Holmes was driving in a school zone during the week after school let out for the day. Holmes, in his interview at the police station, admitted that he reached down for a pack of cigarettes while driving in this area. There was conflicting eyewitness testimony about the traffic lights, crosswalk signals, and the vehicle's rate of speed, but all the witnesses agreed that Holmes's vehicle did not stay at the scene after the accident occurred.

Esparza testified that R.A. was disoriented immediately after the accident and asked Esparza, "What happened to me?" and "Where is my mom?" After Esparza returned from checking on M.K., she returned to find R.A. "lifeless," "white," and "pale." Dr. Lira testified that that when he ran from his clinic to the scene of the accident, he found R.A. motionless. He found nothing when he checked R.A.'s pulse in her arm and carotid artery, or when he used his stethoscope to check for a heartbeat.

Viewing the evidence in the light most favorable to the verdict, we find that a reasonable juror could have determined that Holmes caused R.A.'s death with criminal negligence by driving in a manner that constituted "a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *See Whatley*, 445 S.W.3d at 166; *Jackson*, 443 U.S. at 319; TEX. PENAL CODE ANN. § 6.03(d).

### 3. Deadly Weapon Finding

Holmes further complains that there was insufficient evidence for an affirmative deadly weapon finding in the aggravated assault offense (Count 3) and the negligent homicide offense (Count 4). A "deadly weapon" is defined in the penal code as "anything that in the manner of its use or intended use is capable of causing death or serious bodily

18

injury." *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(B). The question of whether a motor vehicle is a deadly weapon is a two-part inquiry. *See Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009). First, we evaluate the manner in which the defendant used the motor vehicle. *Id*. Second, we consider whether, during the felony, the motor vehicle was capable of causing death or serious injury. *Id*.

Here, the record showed that Holmes admitted to Detective Roman that he reached down to pick up a pack of cigarettes while driving. Although Holmes claimed he "felt something," he continued to drive. When he pulled over a few blocks later to find damage on the front of his vehicle, he could not explain to Detective Roman why he failed to go back and see what he might have damaged with his car. In addition, both testimonial and photographic evidence showed the severe injuries causing R.A.'s death, and M.K.'s severe trauma, surgeries, and rehabilitation. Viewing the evidence in the light most favorable to the verdict, we conclude there was sufficient evidence to sustain the jury's finding that the vehicle was used a deadly weapon. *See Whatley*, 445 S.W.3d at 166; *Jackson*, 443 U.S. at 319. We overrule this issue.

### III. THE ADMISSION OF CERTAIN PHOTOGRAPHS IN EVIDENCE

Holmes's second issue on appeal challenges the trial court's admission of "graphic photographs of the deceased victim at the scene and of the injuries to the second surviving victim because they were more prejudicial than probative."

### A. Standard of Review & Applicable Law

"The admissibility of a photograph is within the sound discretion of the trial judge." *Rodriguez v. State*, 398 S.W.3d 246, 253 (Tex. App.—Corpus Christi–Edinburg 2009, no

pet.) (citing *Shuffield v. State,* 189 S.W.3d 782, 786 (Tex. Crim. App. 2006)). Courts review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010).

When a defendant objects to evidence under Rule 403, the trial court must weigh the evidence's probative value against any danger of unfair prejudice. *See* TEX. R. EVID. 403; *Santellan v. State,* 939 S.W.2d 155 (Tex. Crim. App. 1997). The trial court fulfills this balancing requirement when there is a specific Rule 403 objection by a defendant and the trial court overrules that objection and admits the exhibit into evidence. *See Santellan*, 939 S.W.2d at 171. Relevant evidence carries a presumption that it is more probative than prejudicial and should be excluded only when the probative value is substantially outweighed by the potential for unfair prejudice. *See id.* at 169.

The trial court, when undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobanco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

B.    Analysis

Holmes, prior to trial, filed a motion in limine to limit the number of photographs

20

showing "blood, wounds, or other prejudicial matters." Holmes argued that the photographs of R.A. and M.K.'s injuries were more prejudicial than probative, and he agreed to stipulate to R.A.'s death and M.K.'s serious bodily injuries. The trial court disagreed and ruled that the jury was entitled to "see what occurred."

We address the *Giglioblanco* factors to conduct our Rule 403 analysis. *See* 210 S.W.3d at 641–42. First, the photographs had probative force because they depicted the serious bodily injuries of M.K., which were an element of the aggravated assault count, and the injuries that caused R.A.'s death, which were probative to the negligent homicide count. *Id*. Second, the State had a need for that evidence because M.K. had already healed from her injuries at the time of trial—the photographs depicted the nature of her injuries at the time they occurred. Further, although various witnesses testified regarding both R.A. and M.K.'s injuries, the Court of Criminal Appeals has held that "a visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). "The fact that the jury also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction." *Id*. Third, there was no tendency that the photographs would suggest decision on an improper basis—they were probative of the elements the State had to prove in aggravated assault and negligent homicide. *See id*.; TEX. PENAL CODE ANN. §§ 22.02(a)(2), 19.05; *see also id*. § 1.07(a)(46) (defining "serious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."). Regarding the fourth and fifth factors, there was no tendency

of the photographs to confuse or distract the jury or to give any undue weight to them. *Giglioblanco*, 210 S.W.3d at 641–42. The State admitted ninety-three exhibits, and only six photos were of R.A.'s injuries[2] and twelve photos were of M.K.'s injuries.[3] Sixth, and finally, the presentation of the evidence did not take an inordinate amount of time or merely repeat evidence already admitted. *Id*. We note, in fact, that the trial court carefully considered which photographs would be presented to the jury and did not allow duplicitous evidence:

> I think this jury is entitled to see [the photos]. Now, I'm not interested in having two of the same injuries, so when we get these marked, let's review them one more time before they are presented to the jury because, again, I'm only going to allow one photo of each injury. So, I will not allow the duplicity.

In light of the foregoing analysis, we hold the trial court did not abuse its discretion in admitting photos of R.A. and M.K.'s injuries from the accident scene and hospital because they were more probative than prejudicial. *See Rodriguez*, 398 S.W.3d at 253; *Santellan*, 939 S.W.2d at 167 (holding the trial court did not abuse its discretion in allowing the jury to see photographs of the murder scene and autopsy photos). We overrule this issue.

## IV.     WITNESSES ALLOWED TO REMAIN IN COURTROOM

Holmes's third issue complained that Garza, Wade, and M.K. should not have been allowed to testify when they remained in the courtroom after he invoked the "Rule."

### A.     Standard of Review & Applicable Law

---

[2] The photos of R.A.'s injuries were admitted as SX 3-7 and SX 16.

[3] The photos of M.K.'s injuries were marked as SX 59-70.

"The procedure of excluding witnesses from the courtroom is commonly called putting the witnesses 'under the rule.'" *Russell v. State*, 155 S.W.3d 176, 179 (Tex. Crim. App. 2005); TEX. R. EVID. 614. "The purpose of placing witnesses under the rule is to prevent the testimony of one witness from influencing the testimony of another, consciously or not." *Russell*, 155 S.W.3d at 179. There are exceptions to the "rule," though. Texas Code of Criminal Procedure article 36.03 provides

> Notwithstanding Rule 614, Texas Rules of Evidence, a court at the request of a party may order the exclusion of a witness who for the purposes of the prosecution is a victim, close relative of a deceased victim, or guardian of a victim only if the witness is to testify and the court determines that the testimony of the witness would be materially affected if the witness hears other testimony at the trial.

*See* TEX. CODE CRIM. PROC. ANN. art. 36.03(a). "Article 36.03 was enacted as a part of 2001 legislation strengthening the ability of crime victims and particular witnesses to participate in certain criminal justice proceedings." *Garcia v. State*, 553 S.W.3d 645, 647 (Tex. App.—Texarkana 2018, pet. ref'd) (citing Act of May 14, 2001, 77th Leg., R.S., ch. 1034, § 1, 2001 Tex. Gen. Laws 2290, 2290). "A trial court is without authority to exclude [a qualifying witness] unless the court determine[s] her testimony would be materially affected if she heard the other testimony at trial." *Id*. Additionally, unlike Rule 614, Article 36.03 places the burden on the party seeking exclusion of a witness to make an offer of proof to justify the exclusion." *Id*.

## B.    Analysis

Garza provided no first-hand testimony about the accident. Instead, he testified regarding how he learned about the accident that took his daughter's life and what he saw when he arrived at the intersection at issue. Wade told the jurors about M.K.'s

resulting injuries, surgeries, and rehabilitation process after the accident. And M.K. testified about her experience as one directly impacted by the vehicle and her healing and recovery since the day of the accident. Each of these witnesses had specific, personal testimonies that did not appear to be duplicative or influenced by other eyewitness accounts.

Because Holmes did not show how any of these witness's testimonies were "materially affected" by remaining in the courtroom, we conclude the trial court did not abuse its discretion in allowing Garza, Wade, and M.K. to testify after remaining in the courtroom after Holmes's invocation of the rule. *See* TEX. CODE CRIM. PROC. ANN. art. 36.03(a); *Garcia*, 553 S.W.3d at 647 (where a trial court allowed the mother of a disabled 20-year-old sexual abuse victim to remain in the courtroom during the victim's testimony). We overrule this issue.

## V.    THE JURY CHARGE

### A.    Standard of Review & Applicable Law

The purpose of the trial court's jury charge is to instruct the jurors on the law applicable to the case. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015); *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012); *see* TEX. CODE CRIM. PROC. ANN. art. 36.14. The application paragraph is the portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment or information allegations. *Vasquez*, 389 S.W.3d at 366. Therefore, a jury charge with an application paragraph that incorrectly applies the pertinent penal law to the facts of a given case is erroneous. *Cortez*, 469 S.W.3d at

24

598; *see Gray v. State*, 152 S.W.3d 125, 127–28 (Tex. Crim. App. 2004).

"There are two tests for harm to be applied to any jury charge error, depending on whether there was objection to the error at trial." *Almanza v. State*, 724 S.W.2d 805, 806 (Tex. Crim. App. 1986). If the defendant timely objected to the charge, we look for "some harm." *See id*. If there was no objection lodged, we look for "egregious error." *Id*. Errors that result in egregious harm are those that: (1) affect the very basis of the case, (2) deprive the defendant of a valuable right, or (3) vitally affect a defensive theory. *See Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005); *see also* TEX. R. APP. P. 44.2 (holding that the court of appeals must reverse a judgment unless the court determines that the error did not contribute to the conviction or punishment).

Under *Almanza*, courts evaluate harm by taking into account (1) the entire jury charge; (2) the state of the evidence, including contested issues; (3) arguments of counsel; and (4) any other relevant information contained in the record as a whole. *Gelinas v. State*, 398 S.W.3d 703, 705–06 (Tex. Crim. App. 2013).

## B.    Analysis

On appeal, Holmes asserts that there were two errors in the jury charge: that the instruction in aggravated assault only required "bodily injury" and not "serious bodily injury" and that the charge as written led to a result that failed to ensure juror unanimity.

### 1.  "Bodily Injury," Not "Serious Bodily Injury," Instruction

Holmes first argues that the aggravated assault instruction was erroneous because it only alleged bodily injury, not serious bodily injury, to M.K. The application portion of the aggravated assault read that:

25

2. The defendant did this—
   a. Intending to cause bodily injury; or
   b. Knowing that he would cause bodily injury; or
   c. With recklessness about whether he could cause bodily injury.

The difference between "bodily injury" and "serious bodily injury" is the difference between misdemeanor assault and felony assault. *Compare* TEX. PENAL CODE ANN. § 22.01 *with* § 22.02; *see also id*. § 1.01(a)(8) (defining "bodily injury" as "physical pain, illness, or any impairment of physical condition"); *id*. § 1.07(a)(46) (defining "serious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."). This application paragraph lessened the prosecution's burden of proof, and thus constituted error.

Because Holmes did not object to this erroneous instruction, we look to whether this error caused egregious harm. The first step in our *Almanza* harm analysis is to look at the entire jury charge. *See Gelinas*, 398 S.W.3d at 705–06 (citing *Almanza*, 724 S.W.2d at 806). We note that the instructions for the aggravated assault charge included a definition of "serious bodily injury" and also included the penal code statute for aggravated assault which mentioned "serious bodily injury." The instruction also recited the State's original accusation from the indictment that Holmes "intentionally, knowingly, or recklessly cause[d] serious bodily injury to M.K. . . ." Only the application portion of aggravated assault instruction omitted the "serious" modifier to the bodily injury question.

Second, *Almanza* requires that we look at the state of the evidence. *See id.* at 705–06 (citing *Almanza*, 724 S.W.2d at 806). The jury heard testimony from both M.K. and Wade regarding M.K.'s injuries. Wade testified that when she saw M.K. at the

26

hospital, M.K. was covered in blood and in shock. M.K. recalled pain "radiating" all over her body while she lay in the street after the accident occurred. She testified that she was in the hospital for over a week so that doctors could graft her left severed femoral artery, place her leg in a halo, and insert a titanium rod to stabilize her broken left femur. M.K. stated that she could not walk for two to three months and was relegated to a wheelchair or bed during that time. She still has difficulties wearing certain shoes, leaning down, and walking upstairs. Further, she has scars on her legs, arm, and face. M.K. testified that she cannot wear eye makeup because one of her tear ducts is scarred. The jury also viewed photos that captured the extent of these injuries.

The third and fourth *Almanza* elements ask us to consider arguments of counsel or any other relevant information contained in the record as a whole. *See id.* at 705–06 (citing *Almanza*, 724 S.W.2d at 806). We note that Holmes agreed to stipulate to M.K.'s "serious bodily injuries" for the purpose of keeping certain photographs out of evidence. We find it contradictory that he takes a dissimilar stance on this issue now.

In light of our analysis, we hold that this jury charge error did not (1) affect the very basis of Holmes's case, (2) deprive him of a valuable right, or (3) vitally affect a defensive theory. *See Ngo*, 175 S.W.3d at 750. Although there was error, there was no egregious harm. The incorrect phrase of "bodily injury" instead of "serious bodily injury" in the application paragraph of the aggravated assault instruction did not contribute to Holmes's conviction or punishment. *See* TEX. R. APP. P. 44.2.

### 3. Juror Unanimity

In his second sub-issue, Holmes argues that the charge violated article 5, section

3 of the Texas Constitution and article 36.29 of the code of criminal procedure because it did not require the jury to unanimously agree on "which specific acts of recklessness or criminal negligence Holmes committed." *See* TEX. CONST. art. V, § 3; TEX. CODE CRIM. PROC. ANN. art. 36.29. Here, the charge for both aggravated assault and negligent homicide provided that Holmes caused the serious bodily injury of M.K. and the death of R.A.

> By striking [M.K. or R.A.] with a vehicle while he was running a red light or operating his motor vehicle at an excessive rate of speed or failing to yield to pedestrians in a crosswalk who were then in the process of crossing the street and were struck by his motor vehicle. . . .

The court of criminal appeals has held that while a jury must unanimously agree about the occurrence of a single criminal offense, it need not be unanimous about the specific manner and means of how the offense was committed. *See Young v. State*, 341 S.W.3d 417, 422 (Tex. Crim. App. 2011); *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008). "It is well established that the State may plead in the conjunctive and charge in the disjunctive." *Cada v. State*, 334 S.W.3d 766, 771 (Tex. Crim. App. 2011). Accordingly, a trial court may submit a disjunctive jury charge and obtain a general verdict where there are alternate theories of committing the same offense. *See id.*

Here, the trial court charged the jury in the disjunctive with three ways of committing the same offense—by running a red light, speeding, or failing to yield to pedestrians. This manner of charging the jury is allowed by Texas law and we find no error. *See Young*, 341 S.W.3d at 422; *Landrian*, 268 S.W.3d at 535. We overrule this issue.

## VI.  CRUEL AND UNUSUAL PUNISHMENT

### A.  Applicable Law

An allegation of excessive or disproportionate punishment is a legal claim "embodied in the Constitution's ban on cruel and unusual punishment" and based on a "narrow principle that does not require strict proportionality between the crime and the sentence." *State v. Simpson*, 488 S.W.3d 318, 322–24 (Tex. Crim. App. 2016) (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991)); *see* U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."); *see also Meadoux v. State*, 325 S.W.3d 189, 193 (Tex. Crim. App. 2010) (acknowledging that the Eighth Amendment is applicable to the states by virtue of the Fourteenth Amendment (citing *Robinson v. California,* 370 U.S. 660, 666–67 (1962)). A successful challenge to proportionality is exceedingly rare and requires a finding of "gross disproportionality." *Simpson*, 488 S.W.3d at 322–23 (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)); *Trevino v. State*, 174 S.W.3d 925, 928 (Tex. App.—Corpus Christi–Edinburg 2005, pet. ref'd) (providing that a sentence is unlikely to be disturbed on appeal if it is assessed within the legislatively determined range).

To preserve for appellate review a complaint that a sentence is grossly disproportionate or constituting cruel and unusual punishment, a defendant must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired. *See* TEX. R. APP. P. 33.1(a); *Smith v. State*, 721 S.W.2d 844, 855 (Tex. Crim. App. 1986); *Navarro v. State*, 588 S.W.3d 689, 690 (Tex. App.—Texarkana 2019,

no pet.) (holding that to preserve a disproportionate-sentencing complaint, the defendant must make a timely, specific objection in trial court or raise the issue in a motion for new trial); *Toledo v. State*, 519 S.W.3d 273, 284 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (same).

## B.     Analysis

Holmes did not object in the trial court that the sentence imposed by the trial court was disproportionate to the offense charged or in violation of his constitutional rights. *See* U.S. CONST. amends. VIII, XIV. Accordingly, we hold that Holmes failed to preserve this complaint for our review. *See Smith*, 721 S.W.2d at 855; *Trevino*, 174 S.W.3d at 927–28 ("Because the sentence imposed is within the punishment range and is not illegal, we conclude that the rights [appellant] asserts for the first time on appeal are not so fundamental as to have relieved him of the necessity of a timely, specific trial objection."). We overrule Holmes's second point of error.

## VII.     THE MOTION FOR NEW TRIAL

## A.     Standard of Review

We review a trial court's denial of a motion for new trial under an abuse of discretion standard. *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012); *Salazar v. State,* 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). "We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Holden v. State,* 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); *see Salazar,* 38 S.W.3d at 148. A trial court abuses its discretion in denying a motion for new trial when no reasonable view of the record could support the trial court's

30

ruling. *Holden,* 201 S.W.3d at 763.

**B.    Analysis**

In his first motion for new trial, Holmes contended that there was insufficient evidence to support his enhancement charge on the 2006 felony from Guadalupe County. In his amended motion for new trial, Holmes added that the State failed to disclose exculpatory evidence of two of its witnesses, in violation of article 39.14 of the code of criminal procedure, also known as the Michael Morton Act. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14.

**1.  The Enhancement Charge from Guadalupe County**

Holmes first alleged that the evidence was legally insufficient to support a finding of true on his enhancement charge—the Guadalupe County conviction. "To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction." *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). "While evidence of a certified copy of a final judgment and sentence may be a preferred and convenient means, there are other ways the State may prove both of these elements. *See id*. at 9212–2. These ways include: (1) the defendant's admission or stipulation, (2) testimony by a person who was present when the person was convicted of the specified crime and can identify the defendant as that person or, (3) documentary proof (like a judgment) that "contains sufficient information to establish both the existence of a prior conviction and the defendant's identity as the person convicted." *Id.* at 922.

The State produced a certified copy of the Guadalupe County conviction, meeting

31

the first prong of the *Flowers* test. *Id*. at 921. Second, outside the presence of the jury as Holmes requested, Patrick Whitmore, a fingerprint expert with the Nueces County Sheriff's Office, positively linked Holmes's fingerprints to the fingerprints on the Guadalupe County certified judgment.[4] The trial court made it clear that it did not want to do the *Flowers* prove-up twice, and Holmes agreed that the *Flowers* test had been met with regard to that conviction. Holmes cannot now complain that the jury did not have the opportunity to hear the fingerprint expert when he himself requested to verify the prints outside the presence of the jury. Because there was sufficient evidence that Holmes was tied to this 2006 offense—and Holmes agreed as such—we find that the State proved beyond a reasonable doubt that this judgment was linked to Holmes.

### 2. Alleged Michael Morton Act and *Brady* Violation

In his amended motion for new trial, Holmes argued that the State failed to disclose that two of its witnesses, Delia Flores and Flora Esparza, had prior convictions for crimes of moral turpitude. He contends that this failure to disclose violated the State's obligations under both "[a]rticle 39.14(h) and *Brady v. Maryland*, 373 U.S. 373 (1963)."

The Supreme Court in *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." 373 U.S. at 87. The Texas Court of Criminal Appeals has held that in order to find reversible error under *Brady* and *United States v. Bagley*, a defendant must prove that: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad

---

[4] This judgment was Exhibit 72 in the record.

faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002) (citing *Brady*, 373 U.S. at 83; *Bagley*, 473 U.S. 667 (1985)). "Favorable evidence is that which, if disclosed and used effectively, 'may make a difference between conviction and acquittal.'" *Ex parte Miles*, 359 S.W.3d 647, 655 (Tex. Crim. App. 2012) (quoting *Bagley*, 473 U.S. at 676). Favorable evidence includes both exculpatory and impeachment evidence. *Diamond v. State*, __S.W.3d__, 2020 WL 3067582, *7 (Tex. Crim. App. June 10, 2020).

As a threshold matter, however, Holmes submitted this additional challenge in an amended motion for new trial filed outside the thirty-day window for filing. The amended motion for new trial was filed on February 25, 2019, more than thirty days after the jury sentenced Holmes on January 15, 2019. *See* TEX. R. APP. P. 21.4(a). Accordingly, the trial court could only consider the new ground if the State failed to object to the timeliness of the amendment. *See State v. Moore*, 225 S.W.3d 556, 569 (Tex. Crim. App. 2007) (holding that a trial court has the authority to consider an amendment to a motion for new trial made thirty days after sentence is pronounced but within the seventy-five days it has to rule, "so long as the State does not object."). Here, the State objected to the amendment's untimeliness at the hearing on the motion for new trial. Consequently, the trial court properly concluded that the argument was not timely raised. We overrule this issue.

33

## VIII. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Applicable Law

The right to counsel afforded by the United States and Texas Constitutions requires more than the presence of a lawyer; "it necessarily requires the right to effective assistance." *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011); U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10. To prevail on an ineffective assistance claim, the appellant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Lopez*, 343 S.W.3d at 142. "Unless [an] appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Lopez*, 343 S.W.3d at 142. To satisfy the first prong, an appellant must prove by a preponderance of the evidence that his counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. *Id.* To prove prejudice, an appellant must show that there is a reasonable probability that the result of the proceeding would have been different. *Id.*

"In order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retrospective speculation." *Id.*; *see Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) ("Any allegation of ineffectiveness must be firmly rooted in the record[.]"). Although an appellant may claim ineffective assistance of counsel for the first time on direct appeal, the record in such a case often will be insufficient to overcome the presumption that counsel's conduct was reasonable and professional. *Cannon v. State*,

34

252 S.W.3d 342, 349 (Tex. Crim. App. 2008); *Washington v. State*, 417 S.W.3d 713, 724 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). We note that Holmes did not allege ineffective assistance in his motion for new trial. Accordingly, there was no evidentiary record developed at the hearing on the motion for new trial, and it is extremely difficult to show trial counsel's performance was deficient. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). Under this procedural posture, we will not find deficient performance unless counsel's conduct is so outrageous that no competent attorney would have engaged in it. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Washington*, 417 S.W.3d at 724.

## B.  Analysis

Holmes alleges his attorney was ineffective when he failed to object to the jury charge when it merely listed bodily injury and not serious bodily injury. Holmes further alleges his attorney was deficient when he failed to raise the issue of cruel and unusual punishment. He finally argues this cumulative error was harmful.

First, regarding Holmes's argument that his counsel failed to object to the aggravated assault application paragraph which provided that Holmes caused "bodily injury" to M.K. and not "serious bodily injury," we previously analyzed this issue and found that the jury charge was erroneous but not harmful. Although Holmes's counsel should have objected that the State had to prove "serious bodily injury" instead of "bodily injury," the instructions included the "serious bodily injury" definition and the penal code statute on aggravated assault which requires "serious bodily injury." Furthermore, Holmes even stipulated that serious bodily injuries were not in dispute when he attempted to limit the

35

number of photos in evidence. We thus cannot say that the result of the trial would have been different had counsel objected. *See Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142; *see also Green v. State*, 891 S.W.2d 289, 299 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (where counsel failed to object to a jury charge that defined "knowingly" and "intentionally" incorrectly, but because the application paragraph focused on the result of the appellant's conduct and the closing argument correctly defined the mental states, there was no ineffective assistance). We hold there is not a reasonable probability that but for the error, the result would have been different. *See Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142.

Second, Holmes argues that his attorney's failure to raise the issue of cruel and unusual punishment after Holmes's sentence was imposed was deficient. We note, however, that Holmes's sentences were within the appropriate punishment range after the jury found the enhancement felonies to be true. *See Jagaroo v. State*, 180 S.W.3d 793, 800 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (holding that a sentence within sentencing range is not objectionable). "It is not ineffective assistance for counsel to forego making frivolous arguments and objections." *Id*. (citing *Edmond v. State,* 116 S.W.3d 110, 115 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). We conclude that Holmes's attorney's action in this regard was not deficient.

Lastly, Holmes argues that the failure to object to both the "bodily injury" jury charge and the alleged cruel and unusual sentence resulted in "cumulative error." The cumulative error doctrine recognizes that several errors, even if harmless when separately considered, may be harmful in their cumulative effect. *See Chamberlain v.*

*State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (citing *Stahl v. State*, 749 S.W.2d 826, 832 (Tex. Crim. App. 1988)). Non-errors, however, may not produce harm in their cumulative effect. *Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000). Here, because we have determined that that the failure to object to the jury charge was harmless and there was no error when counsel did not challenge Holmes's sentence, we find this argument unconvincing. We overrule this issue.

## IX. THE JUDGMENTS FOR COUNTS 1 AND 2

Finally, Holmes argues that the judgments regarding Count 1, accident involving death, and Count 2, accident involving serious bodily injury, are in error because they each recite a deadly weapon finding.[5] The record affirmatively demonstrates that the trial court granted a directed verdict on this issue. The court ruled that the offenses were "the old failure to stop and render[] aid" offenses and agreed that there was no evidence to support a deadly weapon finding for Counts 1 and 2. *See* TEX. CODE CRIM. PROC. art. 45.032 ("If, upon the trial of a case in a justice or municipal court, the state fails to prove a prima facie case of the offense alleged in the complaint, the defendant is entitled to a directed verdict of "not guilty."). The court specifically did not rule on this issue for Counts 3 and 4 (aggravated assault and negligent homicide).

The State, in its brief, concedes that the judgments for Counts 1 and 2 are erroneous in this regard. We thus sustain this issue and, in accordance with our authority under Texas Rule of Appellate Procedure 43.2, modify these two judgments to remove the deadly weapon finding. *See* TEX. R. APP. P. 43.2(b) ("The court of appeals

---

[5] The judgments note that the deadly weapon is "not a firearm."

37

may . . . modify the trial court's judgment and affirm it as modified . . . .").

## X.     CONCLUSION

We modify the judgment to remove the affirmative finding of a deadly weapon in

Counts 1 and 2 and affirm as modified.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
29th day of October, 2020.